STATE OF NORTH CAROLINA v. EARL V. PURYEAR

No. 7610SC421

(Filed 6 October 1976)

1. Criminal Law §§ 73, 79— statements made by co-conspirators — no hearsay — admissibility

The trial court in a prosecution for conspiracy to assault a person with a deadly weapon did not err in allowing the victim of the assault to testify as to statements made by defendant, defendant's daughter and wife, and a co-conspirator immediately before and during the assault, since the question for resolution by the jury was not whether the statements were true, and the statements were therefore

State v. Puryear

not hearsay; moreover, the statements were admissible under the rule that if the State offers other evidence tending to show the existence of a conspiracy, the acts and declarations of each party to it in furtherance of the objectives of the active conspiracy are admissible against the others.

2. **Criminal Law § 15— motion to dismiss for improper venue — issue previously determined**

The trial court did not err in failing to grant defendant's motion to dismiss made on the ground of improper venue where the defendant filed a plea in abatement six months before his case was tried denying that the alleged offense took place in Wake County as alleged in the bill of indictment and moving that the case be removed to Johnston County, the judge held a hearing on the plea, denied it, and defendant took no exception to that order, and the evidence presented at the hearing on the plea was not brought forward in the record.

3. **Conspiracy § 7— conspirator acting under duress — propriety of instructions**

In a prosecution for conspiracy to assault a person with a deadly weapon where the assault victim testified that he had formed an impression to the effect that defendant's daughter's participation in the conspiracy was involuntary, the trial court's instruction as to what duress would excuse one from acting as a conspirator and negate the fact that one was a conspirator was proper.

4. **Criminal Law § 114— conspiracy to commit assault — instruction on taking law into one's own hands — propriety**

In a prosecution for conspiracy to assault a person with a deadly weapon where the evidence tended to show that the victim of the assault had sexual relations with defendant's daughter and shared drugs and alcohol with her, and defendant felt the victim should be punished for his immoral and illegal activities, talked of killing the victim, and assembled a squad of henchmen for the purpose of whipping defendant, the trial court's instruction that no person was "justified in taking the law in his own hands" or "in acting as judge, jury and executioner" was proper.

5. **Conspiracy § 8— imprisonment for two years — punishment within statutory limits**

Sentence of imprisonment for two years imposed upon defendant following his conviction for conspiracy to commit a simple assault was not in excess of that allowed by law, since conspiracy to commit a simple assault is a misdemeanor for which no specific punishment is provided by statute, and the crime is therefore punishable by fine or imprisonment for no longer than two years or both in the discretion of the court. G.S. 14-3(a).

APPEAL by defendant from *Bailey, Judge.* Judgment entered 14 November 1975 in Superior Court, WAKE County. Heard in the Court of Appeals 14 September 1976.

The bill of indictment upon which defendant was convicted charged him with conspiracy to assault James Robert Dickens

with a deadly weapon and inflict serious injury upon him. The alleged co-conspirators were Tommie Puryear (his daughter), Ann Puryear (his wife) and other unidentified persons.

The State's evidence tended to show the following:

Defendant's daughter, Tommie Puryear, was a student at Ravenscroft High School. Dickens (who is over 30 years old) first saw Tommie Puryear in the summer of 1974 when she and one of her girl friends came to his apartment on Bashford Road in Raleigh. After their first meeting Dickens and Tommie continued an association that included sharing sex, alcohol and marijuana. Tommie Puryear was a willing participant in these activities. On occasions Tommie Puryear's sister, Toni, furnished the marijuana.

Defendant learned of his daughter's association with Dickens by reading her personal notes. He had also overheard telephone conversations between the two. On 12 February 1975, he telephoned a private detective who had formerly worked as a police officer. They met at a nearby shopping center where defendant explained the problems he was having with his daughter, Tommie Puryear. He asked the investigator to conduct a surveillance of his daughter's after-school activities. Thereafter they had several meetings. Defendant wanted him to find out what his daughter was doing after school. Dickens was not mentioned until, after several meetings, defendant gave him Dickens' name. On one occasion the investigator followed Tommie Puryear as she drove from an evening basketball game at the school to a local apartment complex where she met a man (not Dickens) and talked for about ten minutes.

On 12 March 1975, the investigator, after unsuccessfully attempting to follow Tommie Puryear, went directly to Dickens' apartment on Bashford Road. After waiting at the Dickens' residence for about one half hour, the investigator saw Tommie Puryear arrive. The investigator then called defendant and the two rode by the Dickens' apartment several times. Defendant was angry and made remarks about killing Dickens. He said that he was going to the apartment and whip Dickens. He wanted the investigator to accompany him. The investigator declined and urged defendant to go home and wait for his daughter to come home. Defendant said that he would get Dickens whipped. Defendant opened the trunk of his car and

showed the investigator a pistol, a pair of handcuffs, a rope and a leather whip about three feet long.

On 2 April 1975, at about 1:30 p.m., Tommie Puryear telephoned Dickens at his apartment and told him that her father was out-of-town and that her mother and brother were at a lake. She told Dickens that she had to go to Johnston County to study with a friend but that she would be back that night. She told Dickens that she would come to his apartment that evening between 7:30 and 8:30. Dickens was ill and was in bed when the call came.

Between 7:30 and 8:00 that night, Tommie Puryear again telephoned Dickens at his apartment. She told him that she was having car trouble and was stranded on a rural county road in Johnston County. She said she needed someone to come out there and help her. Dickens asked her if there was not someone else she could call. Tommie Puryear told Dickens that since her parents were out-of-town there was no one else for her to call for help. She then gave Dickens the directions he should follow to reach her. She told him to go about one half mile south of Clayton and then turn left on Highway 42. He was then directed to proceed on Highway 42 for 4 miles to a country store on the left of the highway.

Dickens then dressed and drove to Garner. He bought some gas and followed the directions Tommie Puryear had given him. After driving 4 miles on Highway 42 he saw a car stopped on the road with its parking lights on. Tommie Puryear was in the car and told him her headlights were shorting out. The headlight switch was only pulled halfway out. Dickens pulled the switch fully out and the headlights came on. Tommie Puryear again told him the headlights had been shorting out. Dickens got under the car and shook the wires to see if the lights would go out, and, as he did so, defendant appeared beside the car and announced, "I am Earl Puryear." Defendant told Dickens to go to a tractor disk that was about six feet from the car. Defendant then called out, "Ann, come out and see this S.O.B. that ruined our home." Defendant's wife, Ann Puryear, then came out from beside a nearby building and said that "she didn't want to see the S.O.B." Defendant then tossed the car keys to his wife and told her to take Tommie Puryear with her. Tommie Puryear told defendant, "to do what he had promised" and "to remember what he had promised." As soon as Ann and Tommie Puryear left, defendant, standing about five

State v. Puryear

feet away, pointed a pistol between Dickens' eyes. The pistol was leveled at Dickens with defendant's left hand supporting his right hand. He called, "Ya'll come on out." Upon this command, four men wearing ski masks came from behind Dickens, two on each side of the tractor disk. Defendant then ordered the masked men to "get him." The masked men were all armed with night-sticks eighteen inches long. Dickens started striking out at the assailants who began beating him about the head and face. Dickens was beat into a state of semiconsciousness. Dickens' arms were handcuffed behind his back, a chain was twisted behind his back and he was half dragged and half carried to a nearby implement shed. The men continued to strike him as he was being carried to the shed. After he was taken to the shed, Dickens' hands were handcuffed in front of him around the front end of a piece of farm machinery. Defendant then began to lash Dickens with a leather whip. The others hit him in the head with nightsticks. The men questioned him about his association with Tommie Puryear and his marital status and would beat him even harder when not satisfied with his answers. Dickens pleaded for his life. At one point defendant grabbed Dickens by the hair, jerked him around and cut a plug of hair out of his head saying, "You see how sharp the knife is. Do you know what I am going to do with it?" Defendant then told Dickens that he was going to use the knife to castrate him. Defendant and the others interrupted the beatings·four or five times to conspire on what they should do with Dickens. He could hear them voting on whether he would be killed or cas-trated. After their conferences defendant and his confederates would return to Dickens and beat him for another fifteen or twenty minutes. Dickens heard one of the masked men say, "let's just hurry up, get this thing over with. That he had to get back to Wake Forest." On two occasions a Volkswagen automobile come on the scene and the assailants went out and talked to the driver. During the course of the series of his assaults on Dickens, defendant would take the whip and make him say whatever he wanted him to say. When Dickens would answer a question defendant would tell him that he was lying and strike him harder. He whipped him for leaving his father's business and made Dickens say·that he was a "sorry S.O.B." Dickens admitted to defendant that he had sexual intercourse with his daughter and that he had given her alcohol and drugs. Dickens did not lose consciousness but was so beaten that he

lost strength in his arms and legs and could not stand. He was bleeding from his mouth and thought that he was going to die.

After about two hours defendant and the masked men stopped striking Dickens and, again, conferred with one another. Defendant came back to Dickens and told him that he had been out-voted and that he was going to have to let him go. Dickens' handcuffs were removed. Defendant told him to go home, jerk his phone out of the wall and leave. Defendant told Dickens to leave Raleigh and the State of North Carolina or defendant would have him killed. Dickens was then allowed to leave. He was able to reach a friend's apartment who helped clean his wounds and summoned a deputy sheriff who lived nearby. At that time Dickens had bruises and marks about his back, buttocks and lower legs. His face was bruised, his lips were swollen and there was a small puncture wound in the lower abdominal area. Because of the injuries, Dickens was unable to work for about one month.

Defendant offered no evidence.

The judge instructed the jury to return one of the following verdicts: (1) Guilty of conspiring to commit an assault with a deadly weapon inflicting serious injury as charged in the bill of indictment; or (2) Guilty of conspiring to commit a simple assault; or (3) Not guilty.

The jury returned a verdict of guilty of conspiring to commit a simple assault.

Judgment was entered imposing a sentence of two years, all except 180 days of which was suspended with defendant being placed on probation.

*Attorney General Edmisten, by Assistant Attorney General Thomas B. Wood, for the State.*

*Ragsdale, Liggett & Cheshire, by George R. Ragsdale and Peter M. Foley, for defendant appellant.*

VAUGHN, Judge.

Defendant brings forward thirteen assignments of error grouped into nine arguments. The first two arguments are in support of six assignments of error wherein defendant contends that the judge erred in admitting what defendant contends is hearsay evidence. Defendant further contends that the

admission of the alleged hearsay evidence violated his constitutional right to confront the witnesses against him.

[1]   The exceptions are to the testimony of Dickens when he was allowed:

1. To testify relative to the two telephone conversations he had with Tommie Puryear prior to being seized and scourged by defendant and his masked accomplices. The details of those conversations have been set out in our statement of the facts. In summary, Dickens testified that Tommie Puryear first called early in the afternoon and told him that her parents were away, that she was going to Johnston County and that she would return to Raleigh and meet him in his apartment that night. The second call was placed to Dickens at about the time she was to have met him at his apartment in Raleigh. In that conversation she represented that her car was disabled in an isolated rural area of Johnston County, that her parents were out-of-town and that there was no one else upon whom she could call for help. She gave him specific directions as to the route he should follow in order to reach her.

2. To testify that when he reached the prearranged site, Tommie Puryear told him that her lights had been shorting out.

3. To testify that defendant's wife, Ann Puryear, told defendant, after defendant had directed her to come out and look at Dickens, "she didn't want to see the S.O.B."

4. To testify that one of the masked men who was participating in the assault told defendant and the other assailants, "let's just hurry up, get this thing over with. That he had to get back to Wake Forest."

We hold that the court properly overruled defendant's objections to all of the foregoing evidence.

" 'Evidence, oral or written, is called hearsay when its probative force depends, in whole or in part, upon the compentency and credibility of some person other than the witness by whom it is sought to produce it. . . . ' Expressed differently, whenever the assertion of any person, other than that of the witness himself in his present testimony,

is offered to prove the truth of the matter asserted, the evidence so offered is hearsay. If offered for any other purpose, it is not hearsay." Stansbury, North Carolina Evidence, § 138.

The probative force of Dickens' testimony did not depend on the competency or credibility of any person other than himself. The factual questions for resolution by the jury were whether Tommie Puryear, Ann Puryear and the masked accomplice made the statements he testified he heard them make, not whether the statements were true.

If the jurors believed Dickens' testimony they could find that the statements by the alleged co-conspirators were acts incriminating *them* as members of an active conspiracy and that those acts were in furtherance of the conspiracy. Dickens was the witness whose truthfulness was at issue. The jury could hear his words and observe his demeanor. Defendant was given the opportunity to confront the witness and test his credibility in the crucible of cross-examination. The confrontation clause of the Constitution was, therefore, not transgressed.

If the State offers other evidence tending to show the existence of a conspiracy, the acts and declaration of each party to it in furtherance of the objectives of the active conspiracy are admissible against the other members. *State v. Conrad,* 275 N.C. 342, 168 S.E. 2d 39.

There is ample evidence in the record from sources other than the declarations of the alleged co-conspirators to show the existence of a conspiracy at the time the declarations were made. That evidence includes the following: Defendant was angry with Dickens over his association with Tommie Puryear and has made remarks about killing him. At that time he was carrying a pistol, a pair of handcuffs, a rope and a leather whip in the trunk of his car. Defendant said he "would get" Dickens. Thereafter, at night, defendant, his wife, his daughter and four masked men are shown to be together in an isolated rural area of Johnston County. When Dickens appeared, defendant called for his wife to "come out and see this S.O.B. that ruined our home." Tommie Puryear begged her father to "do what he promised." Defendant called for the masked men, "Ya'll come on out" and then directed the men to "get him." Defendant and the masked group, armed with a pistol, a knife, a whip and nightsticks then proceeded to assault Dickens. Dur-

ing the course of the assaults, reference was made to Dickens' association with Tommie Puryear and the group held several conferences on whether to kill or castrate Dickens. It is a manifest understatement to say only that the foregoing constitutes some evidence that defendant had agreed with one or more of the others that the assault would take place. It is probably only rarely that such direct, clear and convincing evidence is available to point so unerringly to the existence of a conspiracy. Generally, they must be proven by a number of indefinite acts which, standing alone, mean little but when put together permit a reasonable inference that a conspiracy has been formed. Former Chief Justice Stacy once gave this example:

> "If four men should meet upon a desert, all coming from different points of the compass, and each carrying upon his shoulder a plank, which exactly fitted and dovetailed with the others so as to form a perfect square, it would be difficult to believe they had not been previously together. At least it would be some evidence tending to support the inference." *State v. Lea,* 203 N.C. 13, 164 S.E. 737.

For the reasons stated, defendant's assignments of error Nos. 1, 2, 3, 4, 5, and 13 are overruled.

[2]   In his seventh assignment of error defendant argues that the trial judge committed prejudicial error in failing to grant his motion to dismiss on the grounds of improper venue. The motion was orally made and denied when the case was called for trial and again denied at the close of the evidence.

The record discloses that on 8 May 1975, defendant filed a plea in abatement wherein he denied that the alleged offense took place in Wake County as alleged in the bill of indictment and also moved that the case be removed to Johnston County. A hearing was held. On 28 May 1975, Judge Lee entered an order denying defendant's plea in abatement. No exception was taken in that order. The evidence presented at the hearing on the plea is not brought forward. It is, therefore, presumed that the proceeding was free from error and that Judge Lee properly denied defendant's motion. *State v. Overman,* 269 N.C. 453, 153 S.E. 2d 44. The issue having been resolved by Judge Lee in May, Judge Bailey properly declined to overrule Judge Lee's decision when the case was called for trial in November. The assignment of error is overruled.

In his sixth assignment of error defendant contends that the court erred in overruling his motion to dismiss because of the insufficiency of the evidence. As we have previously indicated, it is our opinion that the evidence was sufficient to take the case to the jury. Defendant particularly urges that there was insufficient evidence to show that the conspiracy was formed in Wake County or that any act in furtherance of the conspiracy took place in Wake County. The Superior Court of Wake County had jurisdiction over defendant and the alleged offense. The question of venue, as we said before, was settled when Judge Lee denied defendant's plea in abatement and it was not necessary to relitigate that issue at trial. Defendant, having failed to except to Judge Lee's order is in exactly the same position he would have been had he failed to raise the question of improper venue in the fashion and time required by statute. The question of venue is not an issue for trial after the jury has been empaneled. *State v. Dozier,* 277 N.C. 615, 178 S.E. 2d 412; *State v. Outerbridge,* 82 N.C. 617. For these same reasons any possible error (which we do not concede) in the judge's instruction that the making or receiving of a telephone call in Wake County would be an act occurring in Wake County is rendered harmless. Defendant's eighth assignment of error is, therefore, overruled.

[3]   Defendant's ninth assignment of error is also directed to a portion of the judge's charge. On cross-examination defendant elicited testimony from Dickens that he had formed an impression to the effect that Tommie Puryear's participation in the conspiracy was involuntary. In the portion of the charge to which defendant excepts the judge instructed the jury as to what duress would excuse one from acting as a conspirator and negate the fact that one was a conspirator. Defendant contends that the court entirely misconstrued the nature of the offense for which defendant was being tried. In his brief he argues:

"The trial Court confused and combined the issues of whether Tommie Puryear was acting under duress (an issue which was completely immaterial to this trial) with whether there was an unlawful concurrence between the defendant and his daughter to perform an unlawful act— assault James Robert Dickens."

Defendant concedes that in order to constitute a defense to a substantive criminal charge "the coercion or duress must be

present, imminent or impending, and of such a nature as to induce a well-grounded apprehension of death or serious bodily harm if the act is not done." Defendant argues, nevertheless, that:

> "It must be restated, however, that the defendant was not on trial for the substantive crime of assault, and neither was Tommie Puryear. The question of whether Tommie Puryear feared serious bodily harm could only be relevant if SHE were on trial for a substantive crime and its insertion into its case served only one purpose—to confuse the jurors as to the definition and requirements of proof of a conspiracy."

We believe defendant is mistaken. There is no difference in the degree of criminal intent (or coercion that would negate that intent) required in a prosecution for conspiracy to assault than that required in a prosecution for assault. The same may be said with reference to Tommie Puryear's participation in the conspiracy with defendant. Unless it could be excused (by reason of her having acted under duress) in a prosecution against her, it could not be excused as a defense in a prosecution against defendant for the same conspiracy. The assignment of error is overruled.

Defendant's tenth assignment of error is overruled. A contextual reading of the entire charge does not support the laborious argument brought forward to support the alleged error.

[4] The part in parenthesis in the fo'lowing portion of the charge is the subject of defendant's eleventh assignment of error.

> "Now, Ladies and Gentlemen of the Jury, you should not decide this case upon the basis of your own standard of morals, nor upon what you might like the law to be.
>
> (No person is justified in taking the law in his own hands. No person is justified to constitute himself the keeper of the morals of his fellowman. No person is justified in acting as judge, jury and executioner. You should not decide this case upon the basis of sympathy for anyone, nor upon the basis of anger at anyone. You should decide this case upon the basis of the law that I have given you and the facts as you find them to be.)"

There was evidence in the record tending to show: Defendant felt Dickens should be punished for his immoral and illegal activities. He talked of killing Dickens. He said he would have him whipped. He organized and assembled a squad of henchmen for that purpose. He extracted confessions of crime and misconduct while Dickens was under the lash. Votes were taken on whether he should be killed or mutilated. The panel, apparently against defendant's vote, decided to free Dickens after the scourging. In short, the evidence tended to show that defendant did attempt to take the law into his own hands and act as judge, jury and executioner. In the trial of a criminal case, not every right must run in favor of the accused. Simple justice required that the jury be reminded that notwithstanding the absolutely reprehensible conduct of Dickens, that conduct could not excuse defendant's alleged unlawful attempt to summarily try and punish him for his wrongs. The exception is without merit.

[5]  In his final assignment of error defendant contends that the sentence imposed is in excess of that allowed by law. Defendant argues that the punishment cannot exceed thirty days, the maximum provided for a conviction of simple assault. Defendant is mistaken.

Conspiracy to commit a simple assault is a misdemeanor for which no specific punishment is provided by statute. The crime is, therefore, punishable by fine, by imprisonment for a term not exceeding two years, or by both in the discretion of the court. G.S. 14-3(a).

We find no prejudicial error in defendant's trial or in the judgment entered.

No error.

Chief Judge BROCK and Judge MARTIN concur.